O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY RIDIO,                          ) Case No. CV 12-0189-JPR
                                        )
               Plaintiff,               )
                                        ) MEMORANDUM OPINION AND ORDER
          vs.                           ) REVERSING COMMISSIONER AND
                                        ) REMANDING FOR FURTHER
CAROLYN W. COLVIN, Acting               ) PROCEEDINGS
Commissioner of Social                  )
Security,[1]                            )
                                        )
               Defendant.               )
                                        )
_____ )

I.   PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  This matter is before the Court on the parties' Joint
Stipulation, filed November 5, 2012, which the Court has taken
under submission without oral argument.  For the reasons stated

_____

     [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

below, the Commissioner's decision is reversed and this matter is remanded for further proceedings.

**II.   BACKGROUND**

Plaintiff was born on June 24, 1945.  (Administrative Record ("AR") 42.)  He attended several years of college but did not graduate.  (AR 42-43, 194.)  Plaintiff had worked for about 30 years as a "literary intellectual properties manager" and producer in the film industry and later worked for about three years as a salesman and leasing agent at a car dealership.  (AR 43, 45, 137-39.)  Plaintiff stopped working after he was injured in a car accident during a test drive with a customer on July 2, 2005 (AR 44-45, 278), when Plaintiff was 60 years old.

On August 8, 2008, Plaintiff filed an application for DIB, alleging a disability onset date of July 1, 2005.[2]  (AR 61, 119-22, 125-127.)  After Plaintiff's application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"). (AR 79-81.)  A hearing was held on September 2, 2010, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 39-59.)  On October 7, 2010, the ALJ issued a written decision finding Plaintiff not disabled.  (AR 15-27.)  On November 17, 2010, Plaintiff requested review of the ALJ's decision.  (AR 116-18.)  On November 10, 2011, after considering additional evidence submitted by Plaintiff, the Appeals Council denied his request for review.  (AR 1-5.)  This

---

[2]     Plaintiff's application summary listed a disability onset date of January 1, 2008 (AR 119), but the field-office disability report listed an onset date of July 1, 2005 (AR 125), which is the date the ALJ used in his opinion (AR 15).

1   action followed.

2   **III. STANDARD OF REVIEW**

3       Pursuant to 42 U.S.C. § 405(g), a district court may review

4   the Commissioner's decision to deny benefits.  The ALJ's findings

5   and decision should be upheld if they are free of legal error and

6   supported by substantial evidence based on the record as a whole.

7   § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

8   1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

9   742, 746 (9th Cir. 2007).  Substantial evidence means such

10  evidence as a reasonable person might accept as adequate to

11  support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter

12  v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

13  a scintilla but less than a preponderance.  Lingenfelter, 504

14  F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,

15  882 (9th Cir. 2006)).  To determine whether substantial evidence

16  supports a finding, the reviewing court "must review the

17  administrative record as a whole, weighing both the evidence that

18  supports and the evidence that detracts from the Commissioner's

19  conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

20  1996).  "If the evidence can reasonably support either affirming

21  or reversing," the reviewing court "may not substitute its

22  judgment" for that of the Commissioner.  Id. at 720-21.

23  **IV.   THE EVALUATION OF DISABILITY**

24      People are "disabled" for purposes of receiving Social

25  Security benefits if they are unable to engage in any substantial

26  gainful activity owing to a physical or mental impairment that is

27  expected to result in death or which has lasted, or is expected

28  to last, for a continuous period of at least 12 months.  42

3

U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(ii).   If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.   § 404.1520(a)(4)(iii).   If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(iv).   The claimant has the burden of proving that he is unable to perform past relevant work.   <u>Drouin</u>, 966 F.2d at 1257.   If the claimant meets that burden, a prima facie case of disability is established.   <u>Id.</u>   If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.   § 404.1520(a)(4)(v).   That determination comprises the fifth and final step in the sequential analysis.   § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2005.   (AR 17.)   At step two, the ALJ concluded that Plaintiff had the severe impairments of cervical and lumbar strain.   (<u>Id.</u>)   At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.   (<u>Id.</u>)   At step four, the ALJ found that Plaintiff had the RFC to perform "medium work" with the limitation that Plaintiff could only occasionally perform postural activities and was "mildly limited" in his ability to understand and remember tasks, sustain concentration and persistence, interact with the general public, and adapt to

---

[3]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.   20 C.F.R. § 404.1545; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

workplace change.  (AR 17-18.)  The ALJ concluded that Plaintiff could perform his past relevant work as a car salesman as it was generally performed.[4]  (AR 25-26.)  Based on the VE's testimony, the ALJ also found that Plaintiff could perform other medium- and light-work jobs that existed in the national economy.  (AR 26.) Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 27.)

**V.   RELEVANT FACTS**

On July 2, 2005, Plaintiff was injured during a customer's test drive of a car he was attempting to sell.  (AR 271, 278, 290.)  When paramedics arrived, Plaintiff was "walking around on scene" but complained of head, neck, and shoulder pain.  (AR 278.)  At the hospital, an x-ray of Plaintiff's skull revealed no significant skeletal abnormalities.  (AR 287.)  An x-ray of Plaintiff's cervical spine showed "[m]oderate C5-6 cervical spondylosis" and "[p]ossible left focal carotid vascular calcification."  (AR 288.)  X-rays of his thoracic spine showed "[m]ild lower thoracic bridging osteophytosis."  (AR 289.) Plaintiff was prescribed Vicodin, Anaprox, and Flexeril and was released the same day.[5]  (AR 273-75.)

---

[4]    At one point, the ALJ wrote, "while the claimant may not be able to perform her past work . . . ."  (AR 23.)  Given the incorrect gender of the pronoun and the ALJ's conclusion at the end of the decision that Plaintiff <u>could</u> perform his past work, this appears to be a holdover from an earlier decision that inadvertently was not deleted.

[5]    Vicodin is a combination of acetaminophen and hydrocodone, a narcotic analgesic used to relieve pain. <u>Hydrocodone</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601006.html (last updated Mar. 25, 2013).  Anaprox is a nonsteroidal anti-inflammatory drug used to relieve pain,

Sometime thereafter, Plaintiff filed a worker's compensation claim concerning the injuries he received from the car accident. On October 27, 2005, Plaintiff underwent a lumbar-spine MRI at the request of his chiropractor.  (AR 361-66.)  It showed (1) disc desiccation and decreased disc height at L1 to L2, with a 3.5-millimeter disc protrusion that produced mild spinal-canal narrowing; (2) a 3.5-millimeter disc protrusion at L2 to L3, with bilateral facet arthropathy, mild to moderate spinal-canal narrowing, mild to moderate bilateral neuroforaminal encroachment, and encroachment on the L2 exiting nerve roots; (3) disc desiccation and decreased disc height at L3 to L4, with a 3.5-millimeter disc protrusion, bilateral facet arthropathy, moderate spinal-canal narrowing, moderate to severe bilateral neuroforminal encroachment, and effacement of the L3 exiting nerve roots; (4) disc desiccation and decreased disc height at L4 to L5, with a 2.3-millimeter disc protrusion, bilateral facet arthropathy, mild to moderate spinal-canal narrowing, moderate to severe right and moderate left neuroforaminal encroachment, and impingement on the right and encroachment of the left L4 exiting nerve roots; (5) disc desiccation at L5 to S1, with a 2.6-millimeter central disc protrusion with bilateral facet arthropathy, mild to moderate spinal-canal narrowing, mild bilateral neuroforaminal encroachment, and encroachment on the L5

tenderness, swelling, and stiffness.  <u>Naproxen</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html#precautions (last updated Mar. 25, 2013).  Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. <u>Cyclobenzaprine</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last updated Mar. 25, 2013).

exiting nerve root; and (6) moderate hypolordosis of the lumbar spine, with left lateral convexity. (AR 361-62.)

**VI.  DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) rejecting the opinions of his treating and examining physicians and (2) discounting his subjective symptom testimony. (J. Stip. at 3.)

A.  The ALJ's Evaluation of the Medical Evidence

With regard to his physical impairments, Plaintiff contends that the ALJ erred in rejecting the opinions of examining physicians Lawrence M. Richman and Ray L. Craemer and treating physician Charles Schwarz. (J. Stip. at 4-8, 10-13, 20-21.) With regard to his mental impairments, Plaintiff contends that the ALJ erred in rejecting the opinion of an examining psychologist. (J. Stip. at 8-10, 21.)

1.  Applicable law

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)." Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician. Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater

opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R. § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. § 404.1527(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31).  When a treating or examining physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion.  <u>Id.</u>  The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.  20 C.F.R. § 404.1527(c)(3).

## 2.   The ALJ erred in evaluating the evidence of Plaintiff's physical impairments

Plaintiff contends that the ALJ erred in rejecting the opinions of examining physicians Richman and Craemer and treating

1  physician Schwarz.[6]  (J. Stip. at 4-8, 10-13, 20-21.)  For the
2  reasons discussed below, the Court agrees that the ALJ failed to
3  provide specific and legitimate reasons, supported by substantial
4  evidence, for rejecting the controverted opinions of those
5  examining and treating physicians.

6             a.   The medical opinions

7                  i.   Dr. Craemer

8       On March 2, 2006, Dr. Craemer, who was board certified in
9  orthopaedic surgery, examined Plaintiff as part of his worker's
10 compensation case.  (AR 318-29.)  Plaintiff reported to Dr.
11 Craemer that he thought chiropractic treatments had "helped" and
12 he "had less pain and better motion."  (AR 320.)  Dr. Craemer
13 summarized the October 2005 MRI scan and other medical records
14 (AR 320, 324-25) and noted that Plaintiff was using over-the-
15 counter medications and moved his cervical spine and low back
16 "carefully."  (AR 320-21.)

17      Upon examination, Dr. Craemer found that Plaintiff's
18 cervical and lumbar spine had reduced range of motion,
19 tenderness, and spasm.  (AR 321-23.)  In the upper extremities,
20 sensation was intact, motor power was strong and equal, and
21 reflexes were 2+ and equal.  (AR 322.)  Plaintiff's grip was 22-
22 20-20 on the right and 24-24-22 on the left, and he had trigger
23 finger of the right ring finger.  (Id.)  Sensation in the right

24 ───────────────

25      [6]   Plaintiff also argues that the ALJ erred by failing to
   give "clear and convincing reasons" for rejecting Plaintiff's
26 alleged hearing limitations.  (J. Stip. at 12.)  But as the ALJ
   found (AR 22), the only doctor to opine as to any functional
27 limitations resulting from that condition found that Plaintiff
   had no work limitations or restrictions resulting from his
28 hearing loss (AR 805).  Plaintiff's claim therefore fails.

anterior thigh and right anterior calf was decreased, but
sensation was otherwise intact in the lower extremities.  (AR
323.)  Reflexes in the lower extremities had decreased but motor
power was "strong and equal."  (Id.)  Plaintiff walked with a
"slow gait, but no limp," and he could perform heel and toe
walking "without difficulty."  (AR 322-23.)  His posture was
"abnormal" and he had "lost his lumbar lordosis."  (AR 322.)

     Dr. Craemer diagnosed "[h]yper flexion ligamentous cervical
sprain superimposed on cervical degenerative disease";
"[c]erebral concussion with persistent frontal cephalgia";
"cervical C5-6 degenerative disc disease, pre-existing";
"[l]igamentous low back sprain with right radiculopathy (meralgia
paresthetica)"[7]; "[l]umbar spine degenerative disc disease,
multilevel, preexisting, non symptomatic"; and "[r]ight ring
finger, stenosing tenosynovitis, secondary contusion."  (AR 326.)
Dr. Craemer recommended that Plaintiff be evaluated by a
neurologist, who could prescribe medications and physical
therapy, if necessary; be referred to an anesthesiologist for a
course of lumbar epidurals, if appropriate; undergo hand-surgery
consultation if ring-finger locking persisted; and receive
further testing.  (AR 327-28.)  Dr. Craemer opined that Plaintiff

---

[7]    "Meralgia paresthetica occurs when the lateral femoral
cutaneous nerve — a nerve that supplies sensation to the surface
of [the] outer thigh — becomes compressed, or 'pinched.'"
Meralgia paresthetica, Mayo Clinic, http://www.mayoclinic.com/
health/meralgia-paresthetica/DS00914/DSECTION=causes (last
accessed April 4, 2013).  "The lateral femoral cutaneous nerve is
purely a sensory nerve and does not affect [the] ability to use
[the] leg muscles."  Id.

was "temporarily totally disabled."[8]  (AR 328.)

On April 24, 2007, Dr. Craemer reexamined Plaintiff as part of his worker's compensation case.  (AR 299-314.)  Dr. Craemer noted that Plaintiff had "problems with hearing" and that November 2006 EMG and nerve conduction studies showed "[r]ight C7 radiculopathy with evidence of S1 radiculopathy, both on the left," and "absence of right lateral femoral cutaneous nerve." (AR 301-02.)  Dr. Craemer also summarized Plaintiff's other medical records.  (AR 301-02, 306-09.)

Upon examination, Dr. Craemer found that Plaintiff had tenderness and reduced range of motion of the cervical and lumbar spine and spasm of the cervical spine.  (AR 303-05.)  Sensation in the upper extremities was intact and motor power was strong and equal.  (AR 304.)  Sensation in the right lateral thigh and lateral femoral cutaneous was reduced at 4/5, but sensation was otherwise intact in the lower extremities.  (AR 305.)  Motor power was 4.5/5 in the right tibialis anterior and 5/5 in other lower-extremity muscles.  (Id.)  Reflexes in the upper and lower extremities were "2+ and equal."  (AR 304, 306.)  Plaintiff's

---

[8]     In workers' compensation parlance, "[t]he term 'temporarily totally disabled' means that an individual is 'totally incapacitated' and 'unable to earn any income during the period when he is recovering from the effects of the injury.'" Booth v. Barnhart, 181 F. Supp. 2d 1099, 1103 n.2 (C.D. Cal. 2002) (quoting Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600, 605 (9th Cir. 1996)).  "A period of temporary total disability 'is that period when the employee is totally incapacitated for work and during which he may reasonably be expected to be cured or materially improved with proper medical attention.'"  Id. (quoting W.M. Lyles Co. v. Workmen's Comp. Appeals Bd., 3 Cal. App. 3d 132, 136, 82 Cal. Rptr. 891, 894 (1969)).

grip was 30-30-28 on the right and 24-24-22 on the left, and he had "mild" trigger finger in the right ring finger.  (AR 304.) Plaintiff walked with "an antalgic gait favoring the right leg" but "[h]eel and toe walking [were] accomplished without difficulty."  (AR 305.)

As in his March 2006 report, Dr. Craemer diagnosed "[h]yperflexion ligamentous cervical sprain superimposed on cervical degenerative disease"; "[c]erebral concussion with persistent frontal cephalgia"; "cervical C5-6 degenerative disc disease, pre-existing"; "[l]igamentous low back sprain with right radiculopathy (meralgia paresthetica)"; "[l]umbar spine degenerative disc disease, multilevel, preexisting, non-symptomatic"; and "[r]ight ring finger, stenosing tenosynovitis, secondary contusion."  (AR 309-10.)  Dr. Craemer also diagnosed the additional impairment of bilateral hearing loss.  (AR 310.) He listed his "objective findings" regarding Plaintiff's cervical spine as including "[p]ain on range of motion; tenderness over the cervical spinous ligaments; multilevel on the plain films noted to be abnormal."  (AR 310.)  His findings regarding Plaintiff's lumbar spine included "[p]ain on range of motion, multilevel disc disease noted on MRI; positive straight leg raising; decreased sensation in right lateral thigh; atrophy of right calf."  (Id.)

Dr. Craemer opined that "[f]or the cervical spine," Plaintiff was precluded from repetitive motions of the neck, prolonged postural positioning of the neck in flexion, and repetitive work above shoulder level.  (AR 311.)  For the low back, Plaintiff was precluded from "heavy work" and could not "do

sitting or standing greater than 30 minutes or prolonged walking greater than one hour without a change in position of 5-8 minutes after which he [could] resume a similar period of the same activity and repeat this sequence throughout an eight-hour day." (Id.) Under "Future Medical," Dr. Craemer stated that Plaintiff "will need periodic access for prescription modalities of care" and "should be provided with a pool/spa membership" so he could "handle minor exacerbations on his own." (AR 312-13.) Dr. Craemer noted that Plaintiff "may need a course of physical therapy and/or chiropractic therapy" for "acute exacerbations" and that a transcutaneous-electrical-nerve-simulation unit or electrical simulator "may be indicated on a home basis at the discretion of the treating doctor." (AR 313.) He believed that myofascial injections "may be indicated" for the cervical or lumbar spine and that epidurals "may be indicated" for the lumbar spine, but not for the cervical spine. (Id.) Dr. Craemer stated that he would "not expect operative treatment being indicated in the future" for Plaintiff's cervical spine, but "for the lumbar spine, given the radiculopathy, if he has deterioration he may need operation for the lumbar spine." (Id.) Dr. Craemer stated that if Plaintiff's trigger finger persisted, he would need an "operative release, which is a simple outpatient procedure."[9] (Id.) Dr. Craemer believed that Plaintiff could not return to his former type of work. (Id.)

### ii. Dr. Richman

Dr. Richman, who was board certified in psychiatry,

---

[9] Plaintiff later declined surgery to resolve his trigger finger. (AR 729.)

neurology, and electrodiagnostic medicine, examined Plaintiff on September 20, 2006, and later completed a "Complex Neurologic Consultation/Agreed Medical Examination" as part of Plaintiff's workers' compensation case.[10]   (AR 243-63.)   Dr. Richman summarized Plaintiff's medical records, including Plaintiff's x-rays and MRI and Dr. Craemer's March 2006 report.   (AR 246-56.) Upon examination, Dr. Richman found that Plaintiff had normal cranial nerves, "with the exception of diminished auditory acuity to finger rub on the left," and "full motor force throughout with no evidence of weakness, wasting or fasciculations."   (AR 245.) Plaintiff had "diminished sensation in the C6 and C7 distribution on the right," "diminished sensation over the right thigh in the distribution of the lateral femoral cutaneous nerve," and "diminished sensation of the left lower limb in the L4-5 and L5-S1 distribution."   (AR 245.)   Deep tendon reflexes were "1+ and symmetrical."   (Id.)   His gait was normal but he had an "unstable" tandem gait.   (Id.)

     Dr. Richman found that Plaintiff's cervical spine had tenderness and "straightening of the cervical lordosis with increased tension but no frank spasm."   (Id.)   Plaintiff's lumbar spine had tenderness, a negative straight-leg test, and "straightening of the lumbar lordosis with increased tension but no frank spasm."   (Id.)   Dr. Richman conducted an EMG and nerve study and found "C7 radiculopathy on the right," "S1

---

[10]     Dr. Richman stated that he examined Plaintiff on September 20, 2006, but the report itself is not dated.   (AR 263.)   Dr. Richman referred to Plaintiff's October 22, 2006 sleep study, however, so the report must have been written after that date.   (AR 246.)

radiculopathy on the left," and "absent response of the lateral femoral cutaneous nerve on the right consistent with meralgia parasthetica." (AR 246.) Dr. Richman noted that "[e]lectrodiagnostic testing today does confirm the presence of an injury to the lateral femoral cutaneous nerve of the right thigh, which is a pure sensory nerve," as well as "cervical radiculopathy on the right and lumbar radiculopathy on the left involving the C7 and the S1 root, respectively." (AR 258.) Dr. Richman also noted that Plaintiff had undergone a sleep study in October 2006, which had shown obstructive sleep apnea "of substantial magnitude as well as some elements that support some panic and restlessness." (Id.; see also AR 266.)

Dr. Richman's diagnosis included (1) history of head contusion and posttraumatic headaches related to his car accident, (2) history of posttramatic head syndrome, (3) cervical spine strain/sprain and cervical radiculopathy on the right, (4) lumbar spine strain/sprain and lumbar radiculopathy on the left, (5) injury to lateral femoral cutaneous nerve on the right related to seat-belt injury, (6) obstructive sleep apnea, (7) sleep disturbance unrelated to sleep apnea, and (8) "[t]raumatic-induced" vestibular injury. (AR 257.) Dr. Richman opined that as to his cervical spine, Plaintiff was precluded from "repetitive flexion/extension of the neck and head," working above the shoulder level, and repetitive rotation of the head and neck; as to the lumbar spine, Plaintiff was precluded from "heavy work"; and as to his posttraumatic head syndrome, he was precluded from working in a "very stressful" environment. (AR 260.) Dr. Richman summarily noted that Plaintiff was "not a

1   surgical candidate at the cervical or lumbar levels."  (Id.)

2                              iii. Dr. Schwarz

3        On December 27, 2007, Dr. Schwarz, who specialized in

4   orthopedic surgery, sports medicine, and arthroscopic surgery,

5   examined Plaintiff and completed a "comprehensive orthopedic

6   primary treating physician consultation" as part of Plaintiff's

7   worker's compensation case.  (AR 545-60.)  Dr. Schwarz summarized

8   Drs. Craemer's and Richman's reports and Plaintiff's other

9   medical records, including his MRI, EMG, nerve conduction study,

10  and sleep study.  (AR 553-58.)  Dr. Schwarz also noted that

11  Plaintiff was taking sleeping pills and Motrin.  (AR 548.)

12       Upon examination, Dr. Schwarz found that Plaintiff walked

13  without a limp, could sit and lie down on the examination table

14  without assistance, had "5+/5" strength and intact sensation in

15  the upper extremities, and had intact strength and sensation in

16  the lower extremities.  (AR 549, 552.)  Plaintiff had positive

17  straight-leg-raising tests in the seated and supine positions.

18  (AR 552.)  Plaintiff's grip was 30-28-30 on the right and 30-32-

19  31 on the left.  (AR 553.)  Dr. Schwarz diagnosed cervical spine

20  musculoligamentous sprain with degenerative disc disease;

21  cerebral concussion with persistent frontal cephalgia;

22  lumbosacral spine musculoligamentous sprain with right-lower-

23  extremity radiculopathy and meralgia paresthetica; stenosing

24  tenosynovities, right ring finger; bilateral hearing loss; and

25  psychiatric injury.  (AR 558.)  He recommended that Plaintiff

26  "continue with Motrin for pain and inflamation," undergo

27  operative release of his trigger finger, and see specialists for

28  evaluation of his hearing loss and psychiatric complaints.  (AR

                                    17

560.)  Dr. Schwarz opined that Plaintiff was unable to return to work at that time.  (Id.)

After the initial consultation and report, Dr. Schwarz treated Plaintiff about once a month from January 2008 to at least December 2010 (see, e.g., AR 453-54, 516-17, 523, 544, 684, 778, 782-90, 1011-24) and occasionally submitted reports and authorization requests as part of Plaintiff's worker's compensation case.  On May 23, 2008, Dr. Schwarz completed a prolonged-service report noting that Plaintiff "in the past has had good benefit from chiropractic care" and "[a]uthorization for additional chiropractic care would be appropriate based upon his improvement."  (AR 694.)  On June 6, 2008, Dr. Schwarz completed a prolonged-service report and opined that Plaintiff continued to be temporarily totally disabled.  (AR 690-91.)

On August 14, 2008, Dr. Schwarz completed a "comprehensive orthopedic primary treating physician followup consultation." (AR 427-33.)  Dr. Schwarz noted that Plaintiff walked without a limp and could sit and lie down on the examination table without assistance.  (AR 428.)  Plaintiff had 5+/5 strength, intact sensation, "2+" reflexes in the upper extremities, and intact strength and sensation and "2+" reflexes in the lower extremities.  (AR 428-29.)  A straight-leg-raising test was positive.  (AR 429.)  As in his December 2007 report, Dr. Schwarz diagnosed cervical spine musculoligamentous sprain with degenerative disc disease; cerebral concussion; lumbosacral spine musculoligamentous sprain with right-lower-extremity radiculopathy and meralgia paresthetica; stenosing tenosynovities, right ring finger; hearing loss; and psychiatric

18

injury.  (AR 430.)  Dr. Schwarz stated that he had reviewed Dr.
Craemer's April 2007 report and Dr. Richman's September 2008
report and had "no significant disagreement with the
recommendations as expressed by Dr. Craemer and by Dr. Richman."
(AR 431-32.)  Dr. Schwarz did state, however, that he believed
Plaintiff had an "additional disability/impairment based upon his
hearing loss injury as well as psychiatric injury which have not
been previously addressed."  (AR 432.)

On October 14, 2008, Dr. Schwarz completed a prolonged-
service report stating that Plaintiff continued to experience
"significant pain for the cervical, thoracic and lumbar spine";
"may have fibromyalgia"; and was taking Ambien, cyclobenzaprine,
and Xanax.[11]  (AR 369.)  On December 14, 2009, Dr. Schwarz
completed an authorization request, noting that Plaintiff
complained of stiffness and pain in the lower extremities and had
"significant peripheral edema."  (AR 780.)  Dr. Schwarz requested
authorization for "evaluation for the peripheral edema to
determine causation and possible treatment on industrial basis."
(Id.)  On December 8, 2010, Dr. Schwarz completed an
authorization request noting that Plaintiff had chronic pain and

---

[11]    Ambien is a sedative-hypnotic used to treat insomnia.
Zolpidem, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a693025.html (last updated Feb. 15, 2013).
Cyclobenzaprine is the generic form of the muscle relaxant
Flexeril.  Cyclobenzaprine, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a682514.html (last updated Mar. 25,
2013).   Xanax is a benzodiazepine that is used to treat anxiety
and panic disorders.  Alprazolam, MedlinePlus, http://www.nlm.
nih.gov/medlineplus/druginfo/meds/a684001.html (last updated Nov.
1, 2010).

1    would benefit from chiropractic treatment and acupuncture.[12]   (AR

2    995-96.)

3                          iv.   Dr. Sourehnissani

4         On June 5, 2009, Dr. Mehran Sourehnissani, who was board

5    certified in internal medicine, performed an internal-medicine

6    evaluation of Plaintiff at the Social Security Administration's

7    request.  (AR 735-39.)  Dr. Sourehnissani noted Plaintiff's

8    report that his pain was aggravated by prolonged standing and

9    walking, lifting objects, and bending over, and it was relieved

10   by "rest and pain medication."  (AR 735.)  Dr. Sourehnissani

11   found that Plaintiff had no tenderness or spasm and grossly

12   normal range of motion of the cervical spine.  (AR 737.)

13   Plaintiff had tenderness, spasm, and limited range of motion of

14   the lumbar spine but a negative straight-leg-raising test.  (Id.)

15   Plaintiff had an "unremarkable" neurological examination, showing

16   intact sensation, good motor tone and motion, strength of 5/5

17   throughout, a normal gait, and no atrophy or fasciculation.  (AR

18   738.)  Dr. Sourehnissani noted that x-rays, which were taken in

19   June 2009 and attached to her report, showed "early hypertrophic

20   lipping" and "splinting to the left suggesting muscle spasm."[13]

21   _____

22       [12]    After the ALJ issued his decision, Plaintiff submitted
     to the Appeals Council this record and other additional treatment
23   records from Dr. Schwarz.  (See AR 1-5.)  Because that evidence
     was made part of the record by the Appeals Council, the Court has
24   considered it in "determin[ing] whether, in light of the record
     as a whole, the ALJ's decision was supported by substantial
25   evidence."  Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157,
     1163 (9th Cir. 2012).
26

27       [13]    The x-rays were dated June 11, 2009 (AR 740), but Dr.
     Sourehnissani referred to them in her June 5, 2009 report (AR
28   738).

(AR 738, 740.)  Under "impression," Dr. Sourehnissani stated that Plaintiff was "a 63-year-old male who was involved in a motor vehicle accident in 2005 with residual low back pain."  (AR 738.) She opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk for six hours, sit for six hours, and occasionally climb, stoop, kneel, and crouch.  (Id.)

### b.   Analysis

With regard to Plaintiff's physical limitations, the ALJ found that Plaintiff's serious impairments included only "cervical and lumbar strain" and that he retained the RFC to perform "medium work" that was limited to only occasionally performing postural activities such as climbing, stooping, kneeling, and crouching.  (AR 17-18, 23-24.)  In doing so, the ALJ accorded "little, if any, weight" to the opinions of Drs. Richman, Craemer, and Schwarz and "greater weight" to the opinion of examining physician Sourehnissani.  (AR 20-22, 23-24.)  As discussed below, however, the ALJ failed to give specific and legitimate reasons that were supported by substantial evidence for rejecting the opinions of Drs. Richman, Craemer, and Schwarz.

As an initial matter, the ALJ erroneously concluded that the physicians who submitted reports as part of Plaintiff's worker's compensation case, which included Drs. Craemer, Richman, and Schwarz, described limitations that were "consistent" with the ALJ's findings except to the extent they limited Plaintiff to less than six hours of sitting, standing, or walking in an eight-hour workday.  (AR 22.)  To the contrary, unlike the ALJ, Dr. Craemer found that Plaintiff was precluded from repetitive

21

motions of the neck, prolonged postural positioning of the neck in flexion, and repetitive work above shoulder level; he also found that Plaintiff could not sit or stand for more than 30 minutes or walk for more than an hour without a five- to eight-minute change in position.  (AR 311.)  Dr. Richman similarly found that Plaintiff was precluded from "repetitive flexion/extension of the neck and head," working above the shoulder level, and repetitive rotation of the head and neck. (AR 260.)  And Dr. Schwarz reviewed Drs. Craemer's and Richman's reports and stated that he agreed with their assessments, although Dr. Schwarz believed Plaintiff had additional limitations based on his hearing loss and psychiatric injury. (AR 431-32.)  All three doctors therefore agreed that Plaintiff had limitations exceeding those that were later reflected in his RFC.

The ALJ also appeared to discount the medical reports "generated within the context of a workers' compensation claim" because "reports submitted on behalf of the employee tend to maximize the nature and extent of the injury and resultant limitations, while reports submitted on behalf of the employer tend to emphasize just the opposite."  (AR 22.)  But Drs. Craemer and Richman were selected by agreement of both parties to examine Plaintiff and render opinions as to his impairments and limitations.  (See AR 263 (Dr. Richman's Sept. 2006 "agreed medical examination"; AR 299 (Dr. Craemer's March 2006 "agreed medical examination"); AR 318 (Dr. Craemer's April 2007 "agreed medical re-examination")); see also Cal. Labor Code § 4062.2 (2012) (procedure for parties in worker's compensation case to

together select "agreed medical evaluator").[14]  Their opinions were therefore quite likely to be objective and unbiased.  In any event, the ALJ also erred because "the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1196 n.5 (9th Cir. 2004) (citation and internal quotation marks omitted) (rejecting plaintiff's claim that doctor hired by worker's compensation insurance company was biased); accord Lester, 81 F.3d at 832.  An ALJ, moreover, "may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings." Booth, 181 F. Supp. 2d at 1105.  Thus, the ALJ's rejection of the doctors' reports simply because they were generated as part of Plaintiff's worker's compensation case was unfounded.

The ALJ also rejected Drs. Craemer's and Schwarz's opinions that Plaintiff was temporarily totally disabled for the purpose of his worker's compensation claim because they were "based on criteria other than Social Security Regulations" and because statements of disability "are reserved to the Commissioner."  (AR 22-23.)  It is true that a physician's conclusion on the ultimate issue of disability status is not determinative or entitled to any special weight.  20 C.F.R. § 404.1527(d)(1); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors,

---

[14]  This version of the code was in effect from January 1, 2005, through December 31, 2012.

23

affects ability to engage in gainful activity."). But the fact
that the doctors opined that Plaintiff was disabled does not
justify the ALJ's rejection of their medical opinions regarding
Plaintiff's specific impairments, symptoms, diagnosis, prognosis,
and physical restrictions. See Boardman v. Astrue, 286 F. App'x
397, 399 (9th Cir. 2008) (ALJ erred in "ignor[ing]" doctor's
opinion as to claimant's symptoms, prognosis, and restrictions
"on the ground that [the doctor] also expressed an opinion
regarding [claimant's] ultimate disability and [RFC]"). Here, in
addition to concluding that Plaintiff was temporarily totally
disabled, Drs. Craemer and Schwarz made specific findings, based
on objective medical evidence and personal examination, regarding
Plaintiff's diagnoses, symptoms, and functional limitations,
among other things. The ALJ was required to provide specific and
legitimate reasons, supported by substantial evidence, for
rejecting those specific findings.

     The ALJ also rejected Drs. Craemer's and Schwarz's reports
because they contained "internal inconsistencies," but he failed
to clearly identify those inconsistencies or explain how they
undermined the doctors' findings. (AR 21-22); see Reddick, 157
F.3d at 725 (9th Cir. 1998) (in rejecting medical opinions, ALJ
must "do more than offer his conclusions"; "[h]e must set forth
his own interpretations and explain why they, rather than the
doctors', are correct"). The Commissioner points to Dr.
Craemer's finding that Plaintiff could sit or stand for 30
minutes and walk for an hour before having to change positions
for five to eight minutes, arguing that "[w]alking was far more
strenuous than the standing, and both required an upright

position, such that the ability to walk for twice-as-long periods
simply made no sense." (J. Stip. at 15.) But walking presumably
would accommodate, at least to some extent, Plaintiff's need to
frequently change positions; thus, Dr. Craemer's finding that
Plaintiff could walk for longer periods than he could sit or
stand appears reasonable and internally consistent.

The Commissioner also noted Dr. Schwarz's findings that
Plaintiff suffered from pain and other symptoms but nevertheless
"walked without evidence of a limp," "was able to assume a seated
and supine position on examination without assistance," and had
intact strength and sensation. (J. Stip. at 17.) However,
neither the Commissioner nor the ALJ explained how Plaintiff's
ability to walk during the exam and sit and lie down on the
examining table without assistance are inconsistent with Dr.
Schwarz's diagnosis and other findings, most of which were
established by objective testing. And to the extent that Dr.
Schwarz's finding of intact strength and sensation could arguably
be inconsistent with his diagnoses of radiculopathy and meralgia
paresthetica, Dr. Schwarz apparently reasonably relied on the MRI
results showing "disc protrusions at multiple levels" and
electrodiagnostic studies showing radiculopathy on the right and
left. (AR 431.) Indeed, Dr. Schwarz treated Plaintiff about
once a month for three years, his opinion was supported by
objective evidence such as the MRI and electrodiagnostic testing,
and his findings were consistent with Drs. Craemer's and
Richman's. His opinion was therefore entitled to controlling
weight. See 20 C.F.R. § 404.1527(c)(2) (treating physician's
opinion entitled to controlling weight when well supported by

medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in record); see also Lester, 81 F.3d at 833 ("The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment.").

The ALJ also erred in finding that Dr. Richman's opinion was "generally unsupported by the record." (AR 20.) To the contrary, Dr. Richman's findings were based on his own physical examination of Plaintiff (AR 244-45) and on extensive objective evidence, including x-rays, an MRI, a sleep study, an EMG, and a nerve study (AR 246-47, 250). Dr. Richman's findings were largely consistent with those of Drs. Craemer and Schwarz, who reviewed and relied upon the same objective evidence. (See generally AR 299-314, 318-29, 427-33, 545-60.) The ALJ, moreover, failed to discuss any specific evidence that undermined Dr. Richman's opinion. The ALJ therefore erred in finding that Dr. Richman's opinion lacked record support.

The ALJ's reliance on Dr. Sourehnissani's opinion, instead of those of Drs. Craemer, Richman, and Schwarz, also lacks the support of substantial evidence and is inconsistent with Social Security regulations. Dr. Sourehnissani diagnosed Plaintiff with "low back pain" and found that he could perform medium work that required only occasional climbing, stooping, kneeling, and crouching (AR 738), whereas Drs. Craemer, Richman, and Schwarz

largely agreed that Plaintiff suffered from a variety of
conditions, including degenerative disc disease, cervical and
lumbar strain, radiculopathy, cerebral concussion, trigger
finger, and hearing loss (AR 257, 309-12, 326, 430, 558), and
agreed that he was precluded from heavy work and was limited in
his ability to move his neck and perform above-shoulder work (AR
260, 311, 431-32).  See 20 C.F.R. 404.1527(c)(4) (ALJ will give
more weight to opinion that is "more consistent" with "the record
as a whole").  Moreover, unlike Drs. Craemer, Richman, and
Schwarz, Dr. Sourehnissani apparently did not review any of
Plaintiff's medical records or the other medical opinions, nor
did she consider Plaintiff's MRI, EMG, nerve study, sleep study,
or other clinical evidence.  (See AR 735-39); 20 C.F.R.
§ 404.1527(c)(3) (ALJ will give more weight to opinions supported
by "medical signs and laboratory findings" and evaluate degree to
which doctors "consider all of the pertinent evidence . . .
including opinions of treating and other examining sources").
Dr. Sourehnissani specialized in internal medicine (AR 739), but
the other doctors specialized in areas more relevant to
Plaintiff's back and nerve impairments: Dr. Craemer was board
certified in orthopaedic surgery (AR 318), Dr. Richman was board
certified in psychiatry, neurology, and electrodiagnostic
medicine (AR 261), and Dr. Schwarz specialized in orthopedic
surgery, among other things (AR 545).  See 20 C.F.R.
§ 404.1527(c)(5) (ALJ will "generally give more weight to the
opinion of a specialist about medical issues related to his or
her area of specialty than to the opinion of a source who is not
a specialist").  Moreover, as previously discussed, treating

27

physician Schwarz's opinion is entitled to controlling weight
because his opinion was well-supported by the objective evidence
and consistent with the opinions of the other examining doctors.
See 20 C.F.R. § 404.1527(c)(2).[15]   Thus, the ALJ erred by relying
on Dr. Sourehnissani's opinion instead of those of Drs. Craemer,
Richman, and Schwarz.

The ALJ also categorically discounted the opinions rendered
in the context of Plaintiff's worker's compensation claim because
he found "no evidence of aggressive treatment such as surgery or
emergency hospitalization"; rather, Plaintiff's treatment
"consisted of physical therapy, exercise, and medication, all of
which appear to provide relief." (AR 24.)   Although such
conservative treatment may be grounds for rejecting the opinion
of a treating physician, see, e.g., Rollins v. Massanari, 261
F.3d 853, 856 (9th Cir. 2001) (ALJ may reject opinion of treating
physician who prescribed conservative treatment yet opined that
claimant was disabled), Dr. Craemer opined that Plaintiff may

---

[15]   Although Dr. Schwarz had the most extensive
relationship with Plaintiff, the examining doctors also appear to
be more familiar with Plaintiff and his impairments than Dr.
Sourehnissani.   In his March 2006 report, Dr. Craemer stated that
he had spent one and a half hours "face-to-face" with Plaintiff,
two hours reviewing medical records, and one hour preparing his
report (AR 318); in his April 2007 report, Dr. Craemer stated
that he had spent two hours face to face with Plaintiff, two
hours reviewing Plaintiff's chart, and two hours preparing the
report (AR 299).   In his September 2006 report, Dr. Richman
stated that he had spent two hours face to face with patient,
over two hours reviewing medical records, one hour reviewing
Plaintiff's deposition, and three and a half hours preparing his
report.   (AR 263.)   In her report, Dr. Sourehnissani did not
refer to any of Plaintiff's medical records, nor did she state
how long she had spent with Plaintiff during the exam.   (See AR
735-39.)   Plaintiff testified that the exam took five minutes.
(AR 51.)

also require a transcutaneous-electrical-nerve-simulation unit or electrical simulator, myofascial injections for the cervical or lumbar spine, and epidurals for the lumbar spine (AR 313), which do not appear to be consistent with conservative treatment, see Salinas v. Astrue, No. CV 11-4478-SP, 2012 WL 1400362, at *4 (C.D. Cal. Apr. 23, 2012) (epidural steroid injection "suggests less conservative treatment"); Christie v. Astrue, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize steroid, trigger-point, and epidural injections as conservative).[16]  In any event, even if Plaintiff's conservative treatment were a specific and legitimate reason supported by substantial evidence for rejecting the three doctors' opinions, the Court cannot find that it would render harmless the ALJ's other errors.  Compare Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when "inconsequential to the ultimate nondisability determination").

Plaintiff is entitled to remand on this claim.[17]

### 3.   The ALJ properly evaluated the psychological evidence

Plaintiff contends that the ALJ erred in rejecting the

---

[16]   Dr. Craemer also opined that Plaintiff may need lumbar-spine surgery in the event of "deterioration."  (AR 313.)

[17]   Plaintiff also argues that his back disability met the criteria of Listing 1.04 (J. Stip. at 12) and that the ALJ failed to "translate" the examining doctors' finding in the context of Plaintiff's worker's compensation case that Plaintiff was precluded from "heavy work" (id. at 10).  The ALJ should address these arguments on remand after reconsidering the opinions of Drs. Craemer, Richman, and Schwarz.

opinion of an examining psychologist.  (J. Stip. at 8-10, 21.)
For the reasons discussed below, the ALJ properly analyzed the
medical evidence regarding Plaintiff's psychological impairment.

### a.   Relevant facts

#### i.   Psychologist Feldman

On May 15, 2008, clinical psychologist Bernard Feldman,
Ph.D., completed a comprehensive initial psychological evaluation
of Plaintiff as part of his workers' compensation case.  (AR 332-
55.)  Dr. Feldman found that Plaintiff was "very cooperative,"
with normal speech and above-average intelligence; his mood was
"generally depressed and anxious"; and his thought processes
seemed "moderately impaired."  (AR 336-37.)  Plaintiff reported a
30-year marriage, "characterized by affection, respect and
happiness," and strong social ties.  (AR 339.)  After
administering several psychological tests, Dr. Feldman diagnosed
Plaintiff with major depressive disorder and generalized anxiety
disorder, with a global assessment of functioning ("GAF") score
of 50, indicating "[s]erious symptoms of depression and anxiety
with serious impairment in social and occupational
functioning."[18]  (AR 351.)  Dr. Feldman opined that Plaintiff was
temporarily totally disabled "as a result of his severe
depression and anxiety disorders."  (AR 348.)  He believed that

---

[18]    A GAF score represents a rating of overall
psychological functioning on a scale of 0 to 100.  See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of
Disorders, Text Revision 34 (4th ed. 2000).  A GAF score in the
range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) OR
any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)."  Id.

psychotropic medication "should be considered by a psychiatrist and prescribed on an as-needed basis" and that "[c]ognitive and behavioral therapy should also be provided to [Plaintiff] on a weekly basis." (AR 353.) Dr. Feldman believed that Plaintiff's prognosis was "favorable." (Id.)

ii.  Dr. Gilberg

On June 12, 2008, Arnold L. Gilberg, M.D., Ph.D, who was board certified in psychiatry and neurology and certified in psychoanalysis, examined Plaintiff as part of his worker's compensation case. (AR 379-404.) Dr. Gilberg conducted psychological testing and diagnosed Plaintiff with cognitive and depressive disorder not otherwise specified; he assigned a GAF score of 64, indicating some mild symptoms.[19] (AR 393-95.) Dr. Gilberg opined that Plaintiff had a "very slight" level of impairment in his ability to comprehend and follow instructions; maintain attention and concentration; perform simple and repetitive tasks; maintain an appropriate work pace; maintain a regular schedule; perform complex or varied tasks; make independent decisions or judgments; negotiate, instruct, and supervise; and respond appropriately to changes in work conditions, among other things. (AR 398-99.) Dr. Gilberg found that Plaintiff had a "slight" level of impairment in his ability to relate to other people, get along with peers, respond

---

[19]    A GAF score in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

appropriately to criticism, convince or direct others, and interact appropriately with people, among other things. (AR 399.)

On July 1, 2009, Dr. Gilberg reviewed additional medical records, including Dr. Feldman's report, and completed a supplemental report. (AR 836-38.) Dr. Gilberg noted that Dr. Feldman had found that Plaintiff had a GAF score of 50, which indicated "flat affect, circumstantial speech, few friends and noted conflicts with peers or coworkers." (AR 837.) Dr. Gilberg stated that he had found "no such behaviors" when evaluating Plaintiff, who had been able to complete all psychological testing and provide an adequate history, and who had reported good social relationships and a "wonderful" marriage. (Id.) Dr. Gilberg reaffirmed his June 2009 report, including his finding that Plaintiff had a GAF score of 64. (Id.)

### iii. Dr. Aguilar

On June 13, 2009, Dr. Norma R. Aguilar, a "board eligible" psychiatrist, conducted a complete psychiatric evaluation of Plaintiff at the Social Security Administration's request. (AR 741-45.) Dr. Aguilar noted that Plaintiff reported that he watches television, reads, exercises, bathes, dresses without assistance, gets along well with family members and friends, and had good relationships with others. (AR 742-43.) Dr. Aguilar performed a mental-status examination, finding that Plaintiff had a "slightly depressed" mood, "slightly constricted" affect, and normal speech. (AR 743.) Plaintiff was cooperative and did not exhibit any looseness of association, thought disorganization, flight of ideas, thought blocking, tangentiality, or

circumstantiality.  (<u>Id.</u>)  Dr. Aguilar diagnosed Plaintiff with a
pain disorder associated with psychological factors and a general
medical condition, and she assigned a GAF score of 65 to 70.  (AR
744.)  Dr. Aguilar opined that Plaintiff was not limited in his
ability to follow simple oral and written instructions; follow
detailed instructions; interact appropriately with the public,
coworkers, and supervisors; or comply with job rules concerning
safety and attendance.  (<u>Id.</u>)  Plaintiff was mildly limited in
his ability to respond to changes in a routine work setting,
respond to work pressure in the usual work setting, and perform
daily activities.  (<u>Id.</u>)  Dr. Aguilar opined that Plaintiff's
psychiatric prognosis was fair.  (<u>Id.</u>)

b.  <u>Analysis</u>

With regard to Plaintiff's mental impairments, the ALJ found
that Plaintiff was "mildly limited" in his ability to understand
and remember tasks, sustain concentration and persistence,
interact with the general public, and adapt to workplace change.
(AR 17-18.)  In so finding, the ALJ accorded less weight to the
opinion of psychologist Feldman and "significant" weight to the
opinions of Drs. Gilberg and Aguilar.  (AR 24-25.)

Plaintiff contends that the ALJ "failed to provide any
translation nor offer any reason to reject the opinions of the
[agreed-medical-examination] psychologist."  (J. Stip. at 8.)
Plaintiff repeatedly refers to that psychologist as "Dr.
Gilbert," but the record does not include an opinion from a
psychologist by that name, and Plaintiff in fact cites to and
discusses psychologist Feldman's findings in his initial-
psychological-evaluation report.  (<u>See</u> J. Stip. at 8-10

33

(referring to "Dr. Gilbert" but citing Dr. Feldman's report at AR
332, 343, 351).)   The Court therefore assumes that Plaintiff is
challenging the ALJ's rejection of Dr. Feldman's opinion.   The
ALJ, however, was not obligated to accept Dr. Feldman's
conclusion that Plaintiff was temporarily totally disabled, see
20 C.F.R. § 404.1527(d)(1); see also McLeod, 640 F.3d at 885, and
as discussed below, he also provided legally sufficient reasons
for rejecting Dr. Feldman's medical opinion.

The ALJ noted record evidence that was inconsistent with Dr.
Feldman's finding that Plaintiff had a totally disabling
impairment.   The ALJ noted that no evidence showed that Plaintiff
had received "psychiatric treatment such as individual
psychotherapy or group therapy sessions" or that he had ever been
psychiatrically hospitalized or attempted suicide.[20]   (AR 24.)
Rather, Plaintiff took psychiatric medications, and nothing
"suggest[ed] that such medication [did] not help [Plaintiff]."
(Id.)   The ALJ also noted (AR 25) Dr. Gilberg's finding that Dr.
Feldman's assignment of a GAF score of 50 — which indicated
serious psychological symptoms — was inconsistent with

---

[20]    In June 2008, Dr. Gilberg noted that Plaintiff had been
in treatment with Dr. Feldman on a weekly basis for the previous
two months (AR 383, 391), but notes from that asserted treatment
are not in the record; moreover, in a disability report,
Plaintiff stated that he had seen Dr. Feldman only once, on May
15, 2008, for the purpose of a psychological examination (AR
189), and he did not state in that report or his subsequent
report that he had ever received psychotherapy (see AR 189, 211).
By July 2008, moreover, Dr. Gilberg noted that Plaintiff was "no
longer seeing Dr. Feldman." (AR 444.)   Thus, it is not clear
that Plaintiff in fact ever received psychotherapy, as Dr.
Gilberg noted, but even if he did, it was so brief as to be
negligible.

Plaintiff's ability to complete all psychological testing,
provide an accurate medical history, and maintain good social
relationships (AR 837).   Those constitute specific and legitimate
reasons for rejecting Dr. Feldman's controverted opinion.   See
Batson, 359 F.3d at 1195; Rollins, 261 F.3d at 856.

Moreover, the ALJ was entitled to credit the opinions of
Drs. Gilberg and Aguilar, instead of Dr. Feldman, because their
opinions were supported by independent clinical findings and thus
constituted substantial evidence upon which the ALJ could
properly rely.   See Tonapetyan v. Halter, 242 F.3d 1144, 1149
(9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir.
1995).   Dr. Gilberg reviewed Plaintiff's medical records,
conducted psychological testing, and administered a mental-status
examination before finding that Plaintiff had a depressive
disorder, cognitive disorder, and GAF score of 64, indicating
mild symptoms.   (AR 379-404.)   Dr. Aguilar, moreover, performed a
complete psychiatric evaluation before concluding that Plaintiff
had, at most, only mild psychological limitations.   (AR 741-45.)
Any conflict in the properly supported medical-opinion evidence
was the sole province of the ALJ to resolve.[21]   See Andrews, 53
F.3d at 1041.

---

[21]   It also appears that Drs. Gilberg's and Aguilar's
opinions were entitled to more weight because Dr. Feldman was a
psychologist, whereas Dr. Gilberg was a medical doctor who was
board-certified in psychiatry and neurology and certified in
psychoanalysis and Dr. Aguilar was a medical doctor who was board
eligible in psychiatry.   See 20 C.F.R. 404.1527(c)(5) ("We
generally give more weight to the opinion of a specialist about
medical issues related to his or her area of specialty than to
the opinion of a source who is not a specialist."); Smolen, 80
F.3d at 1285 (same).

Plaintiff argues that the ALJ failed to provide a
"translation" of the workers' compensation terms found in the
"opinion of the AME psychologist." Specifically, Plaintiff
argues that the ALJ "did not understand the significance of 'very
slight to slight' mental limitations in worker's compensation
terminology because even a slight impairment under [workers'
compensation] is a noticeable impairment." (J. Stip. at 9.) Dr.
Feldman, however, did not find that Plaintiff had "very slight to
slight" mental limitations; rather, those findings were part of
Dr. Gilberg's report (AR 398), which the ALJ specifically
credited (AR 25). In any event, even assuming that Dr. Gilberg's
findings indicate that Plaintiff had a "noticeable" impairment,
that would fail to establish any error in the ALJ's conclusion
that Plaintiff had only mild psychological limitations. Indeed,
the ALJ's findings are fully consistent with Dr. Gilberg's
finding that Plaintiff had a GAF score of 64, indicating some
mild psychological symptoms. (See AR 837.)

The ALJ's findings regarding Plaintiff's mental impairment
are entitled to affirmance.

B.   Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide clear and
convincing reasons to discredit his subjective symptom testimony.
(J. Stip. 21-23, 26.) Because the Court finds that the ALJ's
rejection of the opinions of Drs. Craemer, Richman, and Schwarz
was in error, it is not necessary for it to address the remainder
of Plaintiff's arguments. See Negrette v. Astrue, No. EDCV 08-
0737 RNB, 2009 WL 2208088, at *2 (C.D. Cal. July 21, 2009)
(finding it unnecessary to address further disputed issues when

court found that ALJ failed to properly consider treating
doctor's opinion and lay-witness testimony).  On remand, the ALJ
will necessarily reevaluate Plaintiff's credibility after
reconsidering the examining and treating doctors' opinions
regarding Plaintiff's physical impairments.

**VI.  CONCLUSION**

When error exists in an administrative determination, "the
proper course, except in rare circumstances, is to remand to the
agency for additional investigation or explanation."  <u>INS v.</u>
<u>Ventura</u>, 537 U.S. 12, 16, 123 S. Ct. 353, 355, 154 L. Ed. 2d 272
(2002) (citations and quotation marks omitted); <u>Moisa v.</u>
<u>Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004).  Accordingly,
remand, not an award of benefits, is the proper course in this
case.  <u>See</u> <u>Strauss v. Comm'r of Soc. Sec. Admin.</u>, 635 F.3d 1135,
1136 (9th Cir. 2011) (remand for automatic payment of benefits
inappropriate unless evidence unequivocally establishes
disability).  As noted above, on remand, the ALJ will necessarily
reevaluate the opinions of Drs. Craemer, Richman, and Schwarz and
make additional findings regarding Plaintiff's physical
impairments consistent with this opinion.

1
2

## <u>ORDER</u>

3       Accordingly, **IT IS HEREBY ORDERED** that (1) the decision of
4   the Commissioner is REVERSED; (2) Plaintiff's request for remand
5   is GRANTED; and (3) this action is REMANDED for further
6   proceedings consistent with this Memorandum Opinion.

7       **IT IS FURTHER ORDERED** that the Clerk of the Court serve
8   copies of this Order and the Judgment herein on all parties or
9   their counsel.

10
11  DATED: April 19, 2013
12                                          JEAN ROSENBLUTH
                                            U.S. Magistrate Judge
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28